Mr. Adam Murphy will be arguing first for 10 minutes and Anaya will be arguing second with a 5-minute result. Good morning, Your Honors. Anaya, please support Adam Murphy with NYU Law School's Federal Appellate Clinic. On behalf of the appellant, Kyle Millis, it is my great privilege to introduce Sophia Addy and Maya Shamra, two superb law students and soon-to-be law graduates, will be presenting argument this morning under my supervision. Are you the same part of the school as the last group? Yes, Your Honor. Yes, we're all part of the same legal clinic. Very good. Thank you. Thank you. Sophia Addy Good morning, Your Honors. May it please the Court. Sophia Addy appearing on behalf of Mr. Millis. We would like to reserve five minutes for rebuttal. Very well. Welcome. Your Honors, there is no question that but for the erroneous correspondence that Mr. Millis received on November 21st from the Michigan Supreme Court, he would have timely filed his federal habeas petition. Given the Michigan Supreme Court's blatant error and Mr. Millis' demonstrated diligence, this is one of those unique cases where equitable tolling applies. To hold otherwise would be to place the burden of correction on the pro se incarcerated individual who was affirmatively misled rather than the powerful institution. Well, he has to exercise diligence, right? Due diligence? Yes. The standard here. He has some burden, right? Yes, of course. He has to demonstrate reasonable diligence, which I think there is plenty on the record demonstrating how Mr. Millis was diligent. So he gets a letter. So he sends in his petition to the Michigan Supreme Court, right? Yes. We're in the right state here. And then the court sends him a letter on October 28 saying it was untimely or whatever, right? And then on November 14th, there's a docket entry that says it was timely. Now was he aware of that? Yes, Your Honor. Was he aware he had access to that? Yes. That was after he submitted. All right. So then they tell him it's timely. And then a week later, no, six days later, they say, nope, sorry, we made a mistake. We're dismissing your appeal. And then the day after that, they welcome him to the Michigan Supreme Court and say accept it for filing. And we plan to get back to you in seven to eight months, right? Yes. That's kind of the litany that the petitioner had received from the court.  In the space of like three weeks. That is correct, Your Honor. Mr. Millis reasonably relied on the final official correspondence that he got from the Michigan Supreme Court. If we- Yeah. Okay. Go ahead, please. Yeah. Okay. If we look at the nature of the dialogue he had been in with the court, right? There was this back and forth where he had submitted proof of the timeliness of his submission. And if we also look specifically at the nature of the November 20th correspondence that he got from the clerk, it is this very unusual and frankly strange accusation of our client based on hearsay and speculation. I think any petitioner receiving that kind of communication would expect there to be some kind of follow-up. And that is exactly what Mr. Millis believed the November 21st correspondence to be doing. He believed that that correspondence was correcting rather than conflicting with that prior. How do we know that? I mean, it really seems like these letters are sent by two different entities, really. I mean, one is the accusation. I mean, there are two different dates on the form that he gave to the prison official. The date. I mean, the prison official seems to indicate that he or she got the form later than your client said he gave the form to them. We don't even have that on the record. The only thing the clerk says they spoke to some prison staff about was how the mailing form works. And it seems that just based on some staff saying they have to sign it in the presence of an officer, the clerk then says it seems you backdated based on that information he got. So there is not even on the record that some prison official stated this accusation. It seems to be coming solely from the clerk. And I see what you mean about there being a difference in the nature of these correspondences, but I think it's worth noting that the November 21st correspondence does come on the same letterhead. It is signed by the same clerk who sent that letter the day before. And unlike the November 20th... But it doesn't say anything about the previous days. It doesn't say, oh, we're sorry. We realize we sent you this letter the previous day. That was a mistake. It's been accepted.  And oh, by the way, those accusations we made in the other letter, ignore those. I mean, it just seems like, okay, fine, it's confusing. Why wouldn't reasonable diligence here be like, oh, wait, I just got these two conflicting letters a day apart. I better call somebody and figure out what's going on. I think what could explain that is the November 21st correspondence is the first correspondence Mr. Millis received that CCs the prosecutors. They were not privy to any of that prior communication. And I do think the fact that it is the only correspondence CCing the prosecutor does notify to all the parties, or does signal to all the parties that this is the pronouncement to take note of. So to Mr. Millis, again, someone who was pro se incarcerated, moving through this process for the first time, it was reasonable for him, for someone who is not familiar with the different ways a court might communicate things, to rely on that communication. I think it's also worth noting that that is the standard correspondence for how Michigan Supreme Courts notify petitioners that their cases have been accepted for filing. So what makes... Oh, sorry to interrupt you. No, you're fine. Do you know if the case law directs us to take account of his pro se status in navigating all this? Yes. The way we do in construing a pleading by a pro se litigant? Yes, your honor. I mean, does this case law specifically in this area tell us to take account of that or not? Yes, I can point to a few cases. I have Johnson v. Hudson is a Sixth Circuit case, Wiggins v. Ruarts, also Grant v. Swartout, and I believe there are a few others that we cite in there. So in determining diligence, those cases are saying, you know, cut him a break because he's pro se? I think it speaks to the reasonableness standard, right? Because you are... The reasonableness standard does ask us to put ourselves in the position of the petitioner. And so I... Sometimes it's a reasonable person. Right. More generic, right? And it is still reasonable, but it's from the perspective of someone moving through this for the first time. So I think that's what courts mean by when they say that you can and should take into account the pro se status, especially since this is a case equitable in nature. Can I ask you a procedural question? This is a Rule 4 dismissal, right? Yes. Did he... He got a show cause order from the magistrate? So did he have... He had an opportunity to put everything in the record that he was going to put in the record. Is that right? Yes, Your Honor. So we have the document. We have copies of the letters. Did he make any sworn statements? Did he put in a declaration like, I was confused, I got this? Or is there any evidence from him? No, but he does affirmatively explain in his first habeas petition what happened with the Michigan Supreme Court, despite not being asked about it. But did he have a chance in response to that show cause order to put any more evidence in the record? I don't believe he did. I think he still included some attachments to that, yes. But I... Okay, let me ask you this. If the case went back, then I suppose the merits of the equitable tolling would be at issue. It wouldn't be a Rule 4 case, it would just be a regular case, right? And it would still be... The timeliness issue would still be live. I think this court is in a posture to decide the equitable tolling issue. Without Rule 4? Can we just say, okay, we're not sure it's a Rule 4 dismissal, but he just loses on the merits of the equitable tolling, or wins on the merits? Yes, this court is in a posture where it could just decide the equitable tolling issue. Do you have any cases that say that we can do that without remanding? I think it's just the nature of, you know, it would just be a reversal of the district court's decision. I mean, the state's never had a chance to put in any evidence in the record. Surely, we can't decide the issue against them, right? I think you can. I think there is more than enough on the record here demonstrating what happened. There's no question of the extraordinary... But if they want to put in a declaration from Royster about, here's what happened, or... I mean, I don't know what the explanation would be, but it would be... I suppose I would err on the side of, okay, the party that never got a chance to put any evidence in, maybe they'd want to depose your client, for sure, right? Sure, your honor. I think it is, of course, within this court's discretion to remand if you feel that further fact-finding is necessary. Our position, however, is we don't think that is necessary here. There's a clear record of the court's error. This is a quintessential example of an extraordinary circumstance. And there is more than enough on the record demonstrating Mr. Millis's diligence, especially if we consider the fact that courts do seem to focus on diligence as it extends from the extraordinary circumstance that happened here, right? So we look at the fact that Mr. Millis was monitoring his case. He checked on the status of his case in just five months. He immediately, after learning about the court's error, prepared and filed his federal habeas petition in 12 days. And then in the district court, we see him promptly respond to all of the court's requests. And with this court, he filed not one, but two notices of appeals, demonstrating he has taken extra precautions. And I think that is more than enough for this court to be able to decide that equitable tolling applies here. All right. Thank you for your argument. Thank you, Your Honors. Thank you from the state. You may be ready. Don't worry about this. Morning. May it please the Court, Nick Johnson on behalf of Respondent. Reliance on misinformation from a court official must be reasonable. Mr. Millis was repeatedly told his Michigan Supreme Court application for collateral review wasn't timely. On November 20th, 20- Repeatedly told it was timely, too. Correct, Your Honor. So, and Judge Kaplitz, you did go through the timeline. I just would like to add one caveat to that. When Mr. Millis first tried to file, it was actually an e-filing that the Michigan Supreme Court rejected. So, it was actually, I mean, again, he was told multiple times that this application, that rather his e-filing application wasn't timely, and then he tried to submit a paper application. Well, he says he submitted that paper application before the e-filing. That's what he claimed. That's what he claimed.  Yes. Okay. And so, Judge Kaplitz, you noted that when, in November 14th, he was told that it was timely filed. And then on November 20th, he was told that application was dismissed by a Michigan Supreme Court order, in addition to the clerk's letter accusing him of fraudulently backdating his application. So, at that point, on November 20th- Next day. Yeah. On November 20th, there's nothing left. I'm sorry. November 21st, there's nothing before the Michigan Supreme Court for it to even make a determination, for it to even accept, because at that point, there's no application before the court at that point. So- Well, why did they send a letter on that day saying it was accepted for filing? It was- The court seemed to think there was. Yeah.  So, I believe it was April 21st, the clerk sent a letter saying that was an auto-generated error from its acceptance on the 14th.  I mean, but by then, his 95 days for seeking federal relief has expired. So, I mean, why isn't this just a tremendous head fake for a poor pro se litigant to waste the remainder of his time and not get to seek federal habeas relief? Sure. So, at the end of the day, it comes down to whether the reliance on the misinformation was reasonable. And I think your honors had noted that any person that receives this conflicting type of correspondence, the first thing they do would follow up and be like, what's the status of my application? And that applies across the board. I'm not so sure. I mean, you know, sometimes in life, take yes for an answer is a very good approach. And- He's got a letter.  I mean, you know- Well, it's willful ignorance at that point. November 21, it's like checking into a hotel or something. It's like, welcome, you know, it's accepted. We're going to do all this and we'll get back to you in seven, eight months, you know. I mean, who wouldn't? I mean, why isn't it reasonable? Would you have this back and forth to be like, let's just leave it there from his standpoint? If it was adverse, if it was flipped, the order of the last two communications and he just sits on that, I get your point. But why can't, I mean, why can't somebody in his shoes take yes for an answer when he's dealing with a sophisticated entity that has all the knowledge, all the experience, et cetera, et cetera. He has zero. He's just gotten them telling him everything's great. Leave it alone. Sure. So Judge Catholic, you asked for, on my counsel's argument, you indicated, is there any case law regarding, you know, how we treat pro se litigants? And Keeling says that being a pro se litigant and being ignorant of the law is not an excuse. And I'd like to take it a step back and just, even just in terms of just reasonableness, right? If I have my driver's license and I get a letter from the Secretary of State saying my driver's license is revoked, and then I get a letter also saying that it's accepted, I'm going to want to know whether or not I can drive validly, right? It's reasonable for that. And not only that, but the case law tells us, and I cited in my brief, United States v. Petty and United States v. Wheaton, which are two Fifth Circuit decisions, there it comes down to whether, and it was cases involving petitioners receiving misinformation from court clerks. In Petty, it was a district court assistant clerk, and in Wheaton, it was a clerk of the United States Supreme Court. In Petty, it was a different court, right, than the court they were talking about. And that defendant was counseled. Correct. He got incorrect information from his lawyer, too. Correct, yes. So I think a little different. Yeah, absolutely. I'm not saying it's on par one to one, but I think it informs that the inquiry comes down to whether reliance is on misinformation, especially given all the context and everything that happens beforehand. I just, I'm struggling with this being a Rule 4 case. Sure. I mean, we're having a rigorous debate about whether this guy was reasonable or not. I mean, it has to be untimely on its face. We've said frivolous, I think, at times in our cases. I mean, how is it getting to that standard? Maybe he losed, maybe you guys can make a record and win if it gets remanded, but how does it meet Rule 4? I mean, just the grant of the COA suggests that it doesn't meet Rule 4, right? Isn't that inconsistent? So the case law, there's a Seventh Circuit case we cited in our brief, Johnson, that recognizes that there's meaningful tension between a court dismissing under Rule 4 and then in turn granting a certificate of appealability. And granted, it might seem anomalous, but at the end of the day, it's really an exercise of judicial caution and restraint in recognizing that while the timeline that's been submitted or the evidence that's been submitted by the petitioner at this point does not warrant relief. And the district court can make a determination on the timeliness of the application on the face of the application. And Judge Nelbandian, as you noted too, he was even given an opportunity to show cause as to why this should not be submitted. So the record we're working on here, as you indicated, has been entirely created by the petitioner at this point. Did you have, I mean, as a matter of procedure, did you have a right to respond to their response to the show cause order? So we were never ordered to respond. And honestly, I don't believe the state... I'm saying, did you have, I mean, did you have a right to... I haven't done a lot of this Rule 4, 2255 practice, so... As I understand it, the state was never served with it, because typically how it happens is the petition is filed and then the court is the one that orders a response. If it decides it meets the Rule 4 or gets beyond Rule 4, then the district court will order the state to respond and then submit the state materials under Rule 5. And the state has never had an opportunity to respond, either to the petitioner... I'm looking at the rule. Maybe I'm reading the wrong rule. The respondent is not required to answer unless a judge orders. You're not required to, but you're allowed to, I guess. As I understand it, Judge, well, and certainly, but I don't believe that the state of Michigan was ever informed of it. So really, I don't know how we can respond when we don't know that it's existing. That's interesting. I mean, can you... You can kind of understand our concern about all of us being here again someday, potentially, to talk about this again. I mean, is there more that the state would want to be adding to this criminal case? Absolutely. And there is, yes. And that brings to the larger point that, again, the factual record really has been created solely by the petitioner at this point. There's information, for instance, the April 10th letter that he sends to the Michigan Supreme Court asking for a status update. There's inclinations there that maybe he was aware, that he should have been aware of what this ambiguity was, and that he should have acted sooner, essentially. And then there's also, in the filing as well, that disputes some of his assertions regarding the MDOC's handling of his pleadings. And ultimately... Back in October? Correct. Back in October. Yes. When it was e-filed, when it was accepted. And respectfully, I really want to limit to what is presented here, because I don't want to expand on the court's record. I respect that. But I do want to alert the court that, yes, there is information in the Rule 5 material that would further support the state's argument against equitable tolling, and in support of this court's dismissal. I don't know. The whole back and forth about him, and whether he backdated it, or whether, you know, whatever. Whether they just waited, the official waited to send it in. I mean, is that relevant here? Because the question is not whether, you know, he gets to go to the Michigan Supreme Court. It's whether, you know, he can go to the federal court. So I mean, isn't that just collateral, and not really relevant? Yes. I mean, at the end of the day, this court doesn't review a state court's timely decision, right? So that's not something within the purview of this. It does inform, with respect to equitable tolling, though. This is an equitable doctrine. Do we look at whether he has unclean hands? I believe so, yes. And I think that, with respect to the timely decision, it might not, this court might not be able to redetermine that, but it goes to what his knowledge was when he's trying to submit it. And then whether he knew, or should have known, that when he received this 1121 letter, that he was not reasonably relying on that. In fact, he should have inquired sooner than he did. But you're not suggesting there's any additional letters that might be out there that he would have received, or should have received? Again, I mean, I reviewed the Rule 5 material, and I noted a couple different documents that I believe would support it, but I guess in terms of extraneous letters, the one that I can think of is the April 10th letter to the clerk's office asking for the status update. And the substance of that letter, notably, is excluded from the record. And Mr. Millis just never provided it to the district court. I'm trying to just understand, you're suggesting the substance, or the way that letter was submitted suggests that maybe he wasn't being forthcoming? That he had knowledge, or should have known, the ambiguity in the court's determination in November 20th, 21, and that it would have prompted further inquiry to the clerk's office at that point. How do you respond to the point about the government not being cc'd on November 20th, but being cc'd on November 21st? The prosecutor, the local prosecutor. Well, the government, yeah. Right. So I think it's important that it was a dismissal order on the 20th. So I believe that the local prosecutor would have had notice of that. In addition, this is a collateral, this is an application for collateral review in the Michigan Supreme Court. And I can tell you from experience, it's not uncommon for a prosecutor to not respond to that. I mean, because at this point, all his applications in direct appeal and on collateral appeal have all been by leave, because he pled guilty. I have some experience in this area as well. I guess what I'm wondering is, November 21st, government prosecutor receives this notice, and the state's position is, that's actually not true. It's not timely accepted. And so wouldn't the government or the prosecutor or somebody maybe connect with the court and say, hey, you need to correct this letter? Again, in my experience, typically with an application in the Michigan Supreme Court on collateral review, the prosecutor is not going to take action unless it's ordered by the court. And so, and particularly, because there's no indication that the prosecutor responded when the collateral application was before the Michigan Court of Appeals, rather. So I think at that point, it was, and then obviously, there's the dismissal order on the 20th. And so, if anything, it was the petitioner's burden to bring the ambiguity to the court at that point. So is it, just to be clear, is it your position that in this appeal, we should just be making a rule for determination whether on the papers, the court was right to say it's like plainly should be dismissed or whatever? And that, you know, just at that sort of more demanding standard for dismissal, as opposed to kind of a more de novo, so to speak, determination of whether he was diligent? I understand where you're coming from.  I mean, it's different standards. Rule four is like, it's obviously untimely. That's not, that's not the same question as, you know, looking at it in an evenhanded way. Is it untimely? I think, and I recognize the court's trying to navigate its path on how to get, on what exactly the standard is, which is certainly important. But I think under either standard, really, the record that he's even provided establishes that the district court did not err. And whether that's- Do you think, do you think we could resolve the issue against him on, not on the rule four standard, but on, essentially, on the merits? There's enough, he's made the best record he's going to make. I mean, that's what it would come down to, right? Yeah, I believe so. He's had the opportunity to present his burden and the documentation in support of what- What if he said, well, I want to take the deposition of Royster and I want to ask him how many times his employees have gotten disciplined for sending out the wrong correspondence and how often they get audited by the Department of Corrections and all that kind of stuff? So I don't know if that would be an improper expansion of the lower court record. I mean, because obviously on EDPA and habeas, this court doesn't typically develop facts. And as I understand it, those facts wouldn't be in the rule four- But this would be for an equitable tolling, right? So it's not really, I agree with you. You can't expand the record under pinholster for the merits, I guess. But if you're doing cause and prejudice or whatever, or you're trying to figure out whether you're timely, isn't there more leeway? I guess I don't know. I think the only thing that would help Mr. Millis in this case is his own affidavit, self-serving affidavit at that point, explaining why his reliance on the clerk letter was reasonable. But we think he had a chance to put that in if he had wanted to. He did. And I do believe that there is portions in the rule five material that obviously is not before this court, but also I know that he submitted a sworn statement with respect to the timing decision back in October. I do recall seeing that within the rule five. So, but again, and yes, he has had the opportunity to present his arguments. And really, his petition also explains why he thought his reliance was reasonable. So, I don't know that him being able to remand back and essentially expand the record would really add anything at this point. If anything, it would be the state that would be able to supplement his argument. So, I see my time has expired. Just, we'd ask this court to affirm. Thank you. All right, Mr. Johnson. We appreciate your straightforward answers. Thank you. We'll hear rebuttal. Your Honors, and may it please the court, Maya Shumra on rebuttal for Appellant Mr. Millis. I have two quick points. First, opposing counsel relies on Petty and Wheaton, which are not only out of circuit, but incredibly distinguishable. Neither case was decided in the rule four posture. And then beginning with Wheaton, Wheaton. To help you or hurt you that it's not the rule four posture? I think that helps us because that demonstrates that this court can decide on the merits of equitable tolling. And allow for the case to continue in its regular proceedings at the district court level. Do you happen to know whether the state, you know, actually had responded to the show cause order in the district court? I mean, whether they rounded out the record in the district court in a way that seems not to have happened here? Your Honor, we also reviewed the entire record and the entire docket and the court was not, excuse me, the state was not served at the district court level. This case? Yes, this case. Do you have knowledge? I mean, I'm not saying you should necessarily, but do you know in those other cases, is it a similar posture? Was it in the other cases in the sense of the incompleteness of the record before the court? Your Honor, I'm not totally sure, but I assume because they were not deciding the rule four posture that the state was likely served in those cases. And in this case, at the appellate, at this court's level, we actually served the state so that they would have the opportunity to respond. And at this point, we have 100 plus pages of briefing and there are no undisputed facts such that this court can determine the merits of equitable tolling. And so going back to Wheaton, Wheaton is the inverse of the facts of this case. Can they depose your client? Why wouldn't they depose your client? So what did you know? What did you, I mean, or maybe you didn't, I don't know. I mean, why wouldn't they want, if I were them, I'd want that opportunity. Your Honor, they could, but I think my friends on the other side of the court also agree that this court can decide the merits of equitable tolling right now. I think they would say we could decide it against your client because, I mean, it's a heads I win, I guess. But it's, I think what I was hearing was you have made the best record you're going to make. So if we think you lose on that record, you lose. We haven't made any record. So if you think that they don't lose, then you have to give it back so that we can make our own record, right? I mean, that's, I mean, that seems reasonable, by the way, as far as I'm concerned, because they haven't had a chance, right? I mean, the whole point of Rule 4 is they don't even get service. So they're, you know, the court basically just does it as a screener and they benefit from it. But they don't get punished for not, you know, because they weren't, because they didn't get served and didn't respond. Yes, you're right, Your Honor. And I mean, this court very well could remand and just decide on the Rule 4 case. But again, all the undisputed facts here demonstrate that Mr. Millis should be granted equitable tolling. It's undisputed that the final letter received by Mr. Millis was that his case had been accepted for docketing. It's undisputed that he asked about the status of his case within five months, which in Petty, the petitioner never followed up. And in Wheaton, the petitioner did not submit his habeas petition for nearly 12 months, whereas Mr. Millis submitted his habeas petition 12 days after learning about the court's mistake. And it's undisputed that Mr. Millis, yes, like I said, that he followed up with it. He submitted his habeas petition within 12 days. And in Petty, the petitioner relied on incorrect second-hand information given to him by his assistant, who had spoken to a court clerk, even though the petitioner had received correct information from the attorney and the court. In this case, Mr. Millis, the incorrect information that he received was directly from the court in official written correspondence. And in Wheaton, the last correspondence received by the petitioner was that his cert petition had been dismissed by the Supreme Court for untimeliness, where here the last correspondence was that his case had been accepted. And then finally, to my last point, Mr. Millis being pro se goes to the equities of this case. And specifically, we can look to Johnson versus Hudson in this circuit, knowing that the petitioner was timely in filing his motions, even when filing them pro se. And so for the foregoing reasons, we ask this court to grant equitable tolling and reverse the district court's decision. OK. Well, again, I would like to thank everybody, really, for their representation in this case. And we have the same student clinic and Ms. Addy and Ms. Chamra. I think you really distinguished yourselves in your first argument in a federal court of appeals, I presume. And you've given your client first rate representation, as you have, Mr. Johnson. So we thank you all. Case will be submitted. Clerk may adjourn court.